J-E01002-22

2022 PA Super 204

TIMOTHY A. UNGAREAN, DMD D/B/A : IN THE SUPERIOR COURT OF
SMILE SAVERS DENTISTRY, PC, : PENNSYLVANIA
INDIVIDUALLY AND ON BEHALF OF A :
CLASS OF SIMILARLY SITUATED :
PERSONS :
:
:
:
v. :
:
: No. 490 WDA 2021
:
CNA AND VALLEY FORGE :
INSURANCE COMPANY :
:
Appellants :

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-20-006544

TIMOTHY A. UNGAREAN, DMD D/B/A : IN THE SUPERIOR COURT OF
SMILE SAVERS DENTISTRY, PC, : PENNSYLVANIA
INDIVIDUALLY AND ON BEHALF OF A :
CLASS OF SIMILARLY SITUATED :
PERSONS :
:
:
:
:
v. :
:
: No. 948 WDA 2021
:
CNA AND VALLEY FORGE :
INSURANCE COMPANY :
:
Appellants :

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-20-006544

BEFORE: PANELLA, P.J., BENDER, P.J.E., BOWES, J., LAZARUS, J., STABILE,
J., KUNSELMAN, J., NICHOLS, J., McLAUGHLIN, J., and KING, J.

OPINION BY PANELLA, P.J.: FILED: NOVEMBER 30, 2022

Like so many other businesses, the dental practice of Timothy Ungarean, DMD, d/b/a Smile Savers Dentistry, PC ("Ungarean") suffered significant losses when business was disrupted by the COVID-19 pandemic. Ungarean sought coverage for those losses under the business interruption provisions of the business insurance policy he had bought from CNA and Valley Forge Insurance Company ("CNA") ("CNA Policy"). After CNA denied his claim, Ungarean filed a complaint seeking a declaration under the Declaratory Judgments Act, 42 Pa.C.S.A. §§ 7531-7541, that the CNA Policy covered his loss. Ungarean followed that complaint with a motion for summary judgment, which the Allegheny County Court of Common Pleas granted. The court declared Ungarean was entitled to business interruption coverage because COVID-19 and the related governmental orders had caused Ungarean to suffer a direct physical loss of his dental practice, which was within the ambit of coverage provided by the CNA Policy. Moreover, the court found that the exclusions CNA tried to invoke to deny coverage were not applicable to Ungarean's claim.

We are in full agreement with the court's conclusions. We are also in full agreement with the court's reasoning in support of those conclusions. Therefore, based primarily on the trial court's thoughtful opinion, we affirm the court's order granting summary judgment and declaring that coverage is

owed to Ungarean for his COVID-related business losses under the specific terms of the CNA Policy.[1]

The bulk of the factual background leading to this appeal is uncontroverted. Ungarean owns and operates a dental practice, with an office in Pittsburgh and an office in Aliquippa. The practice of dentistry necessarily requires close contact not only between the dentist and his patients, but also between the patients and various staff at the office.

To protect himself from unforeseen interruptions of his practice, Ungarean procured an insurance policy from CNA that provided coverage for certain losses associated with the dental practice during the year from April 1, 2019, to April 1, 2020. In March 2020, the state of Pennsylvania was struck by the full force of the COVID-19 pandemic. COVID-19 is a novel contagious virus that can cause severe acute respiratory illness. In the first three months of the pandemic, it killed thousands of Pennsylvanians, and over 100,000 people nationwide.

After consulting with public health experts, Governor Tom Wolf issued several orders in March 2020 directing that all non-essential businesses should close until further notice. Further, the Governor issued an order directing the residents of Allegheny County, which contains the city of Pittsburgh, to stay at home.

_____

[1] Given our reliance on the trial court's opinion, we have attached a copy of that opinion to this one.

In addition to these shutdown orders, public health officials implemented masking and social distancing protocols. Even those businesses that were deemed essential were required to modify their business models by decreasing the number of people allowed in buildings and requiring people to remain masked. Furthermore, in these early months, enhanced cleaning protocols were implemented due to fears that the virus could linger for days on hard surfaces.

As a result of the pandemic, Ungarean was forced to close his dental practice to the public except for emergency dental procedures. He claims this caused a drastic loss in income from the practice, causing him to furlough employees and suffer other harmful consequences. As a result, Ungarean filed a claim with CNA for these losses under the CNA Policy which provides coverage for, *inter alia*, loss of business income due to the physical loss of or damage to covered property. CNA denied coverage on the basis that Ungarean's dental practice did not suffer physical damage.

Ungarean filed a class action complaint asserting one count of relief under the Declaratory Judgments Act. **See** Complaint, 6/5/20, at ¶ 77. In essence, Ungarean sought a declaration that his pandemic-related business losses were covered under the CNA Policy's Business Income, Extra Expense and Civil Authority provisions. **See id.** at ¶¶ 7, 31, 34. Ungarean subsequently filed a motion for summary judgment, which the trial court granted on the basis that Ungarean had, in fact, suffered a direct physical loss of his dental

practice and was therefore owed business insurance coverage under the policy.[2] CNA filed a timely notice of appeal and raises two issues:

> 1.Whether [Ungarean] is entitled to business insurance coverage under the [CNA Policy] as a result of the Covid-19 pandemic and associated orders issued by Governor Wolf where [Ungarean] did not suffer "direct physical loss of or damage to" property and no order, issued as a result of "direct physical loss of or damage to" property, prohibited access to [Ungarean's] property, which are required to trigger coverage under the policy?

> 2. Whether the Contamination, Consequential Loss, Fungi, Wet Rot, Dry Rot, and Microbes, and Acts of Decisions, Ordinance or Law exclusions in the [CNA Policy] bar coverage for [Ungarean's] alleged losses related to the Covid-19 pandemic and associated orders issued by Governor Wolf?

Brief for Appellant at 2 (trial court's answers and suggested answers omitted).

At the core, CNA challenges the trial court's declaration under the Declaratory Judgments Act that Ungarean was entitled to coverage under the CNA Policy. "The purpose of the Declaratory Judgments Act is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" **Allen**, 692 A.2d at 1092-93. "In reviewing a

---

[2] The same order denied the cross-motion for summary judgment that CNA had also filed. Normally, the denial of a motion for summary judgment is not a final order and therefore is not immediately appealable as a collateral order. **See** Pa.R.A.P. 341. However, in the context of an action under the Declaratory Judgments Act, the trial court's order denying CNA's motion for summary judgment is part and parcel of its order declaring that Ungarean was entitled to coverage under his insurance policy with CNA. Therefore, both the grant of summary judgment to Ungarean and the denial of summary judgment to CNA constitute final orders in this matter. **See Gen. Acc. Ins. Co. of America v. Allen**, 692 A.2d 1089, 1095 (Pa. 1997). Historically, courts often resolve insurance coverage disputes under the Declaratory Judgments Act through summary judgment. **See Kline v. Travelers Pers. Sec. Ins. Co.**, 223 A.3d 677, 685 (Pa. Super. 2019).

declaratory judgment action, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law." **Kline**, 223 A.3d at 684. We review the trial court's decision "as we would a decree in equity." **Id**. As such, we defer to the factual findings of the trial court unless they are unsupported in the record. **See id**. In contrast, we give no such deference to the trial court's application of the law. **See id**.

In this action, Ungarean sought to settle whether the CNA Policy covered his losses arising from the COVID-19 pandemic. This presents a question of law for our review. **See Kramer v. Nationwide Prop. and Casualty Ins. Co.**, 271 A.3d 431, 436 (Pa. Super. 2021). In conducting that review, we are mindful that "disputes over coverage must be resolved only by reference to the provisions of the policy itself." **Id**. (citation omitted). It is therefore imperative that we look to the text of the CNA Policy, because just as in every case in which an insured claims business related losses caused by COVID-19, each individual policy must be examined based solely on its own language.

<u>Business Income and Extra Expense Provisions</u>

The trial court first found that Ungarean was entitled to coverage under the CNA Policy's Business Income and Extra Expense provisions, which state in relevant part:

> 1.b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. …

> 2.a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2a. The policy defines "suspension" as "[t]he partial or complete cessation of your business activities; or … [t]hat a part or all of the described premises is rendered untenantable." CNA Policy, Businessowners Special Property Coverage Form, at G.29. Further, the policy defines "operations" as "the type of your business activities occurring at the described premises and tenantability of the described premises." *Id.*, at G.19.

<u>"Direct physical loss of or damage to"</u>

The provisions provide coverage for the loss of business income and extra expenses incurred due to the suspension of an insured's operations caused by a "direct physical loss of or damage to" the covered property. **See** CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2a. As the trial court makes clear, whether Ungarean's claim is covered under these provisions of the CNA Policy hinges on the meaning of the phrase "direct physical loss of or damage to property." Trial Court Opinion, 3/25/21, at 10. CNA argues that the phrase necessarily requires a physical alteration to the subject property, and any other interpretation is unreasonable. Ungarean, meanwhile, argues that it is reasonable to interpret the phrase as

encompassing the loss of use of the property even in the absence of actual physical harm to the property.

Importantly, the CNA Policy does not define "direct," "physical," "damage," and, perhaps most significantly in our view, "loss." The trial court therefore turned to the dictionary definitions of these words to determine whether Ungarean's interpretation of the phrase as including the loss of use of his property was a reasonable one. *See Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1231 (Pa. Super. 2002) (stating that courts may utilize dictionary definitions to inform its understanding of the language of a contract). The court emphasized that this determination was crucial because "if the contractual terms are subject to more than one reasonable interpretation, [the] [c]ourt must find that the contract is ambiguous," and ambiguous provisions must be construed in favor of Ungarean as the insured. Trial Court Opinion, 3/25/21, at 10-11 (*citing Madison Constr. Co. v. Harleysville Mutual Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999), and *Kurach v. Truck Ins. Exchange,* 235 A.3d 1106, 1116 (Pa. 2020)). Ungarean's interpretation of an ambiguous contract need only be reasonable to be controlling. *See Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978); *see also Consol. Rail Corp. v. ACE Prop. & Casualty Ins. Co.*, 182 A.3d 1011, 1026 (Pa. Super. 2018).

In finding that Ungarean's interpretation was, at the very least, reasonable considering the ordinary meaning of the operative words, the trial court explained:

> This [c]ourt [begins] its analysis [of what the phrase 'direct physical loss of …. property' reasonably means] with the terms 'damage' and 'loss,' as these terms are the crux of the disputed language. … '[D]amage' is defined as 'loss or harm resulting from injury to person, property, or reputation…' and 'loss' is defined as 'DESTRUCTION, RUIN …[and/or] the act of losing possession [and/or] DEPRIVATION…
>
> Based upon the above-provided definitions, it is clear that 'damage' and 'loss,' in certain contexts, tend to overlap. This is evident because the definition of 'damage' includes the term 'loss,' and at least one definition of 'loss' includes the terms 'destruction' and 'ruin,' both of which indicate some form of damage. However, [ ] in the context of this [CNA Policy], the concepts of 'loss' and 'damage' are separated by the disjunctive 'or,' and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, *i.e.,* destruction and ruin. Applying this definition gives the term 'loss' meaning that is different from the term 'damage.' Specifically, whereas the meaning of the term 'damage' encompasses all forms of harm to [Ungarean's] property (complete or partial), this [c]ourt conclude[s] that the meaning of the term 'loss' reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to [the] property.

Trial Court Opinion, 3/25/21, at 12-13 (capitalization and some ellipses in original, footnotes citing Merriam-Webster Dictionary for definitions of terms omitted).

The trial court's reasoning is both straightforward and compelling. The CNA Policy provides coverage for "direct physical loss of or damage to the

property. . . ." CNA, as the insurer, wrote that phrase in the disjunctive, meaning that "direct physical loss" must mean something different from "direct physical damage." **See In re Paulmier**, 937 A.2d 364, 373 (Pa. 2007) (stating that "'or' is disjunctive. It means one or the other of two or more alternatives."). The definition of "loss" includes the loss of possession or deprivation of the property, whereas damage does not; it is therefore reasonable to find that "loss of property" includes the act of being deprived of the physical use of one's property. We are convinced the trial court's reasoning is correct, and results in a reasonable interpretation of the CNA Policy. **See Collister**, 388 A.2d at 1353; **Consol. Rail Corp.**, 182 A.3d at 1026.

CNA argues, however, that the trial court's analysis is fatally flawed because it writes the words "physical" and "direct" out of the contract. To the contrary, the trial court explained that it had:

> also considered the meaning and impact of the terms 'direct' and 'physical.' Ultimately, [the court] determined that the ordinary, dictionary definitions of the terms 'direct' and 'physical' are consistent with the above interpretation of the term 'loss.' … '[D]irect' is defined as 'proceeding from one point to another in time or space without deviation or interruption … [and/or] characterized by close logical, causal, or consequential relationship …' and 'physical' is defined as 'of or relating to natural science … having a material existence … [and/or] perceptible especially through the senses and subject to the laws of nature….' Based upon these definitions it is certainly reasonable to conclude that [Ungarean] could suffer 'direct' and 'physical' loss of use of [his] property absent any harm to [the] property.
>
> Here, [Ungarean's] loss of use of [his] property was both 'direct' and 'physical.' The spread of COVID-19, and a desired limitation of the same, had a close logical, causal and/or consequential relationship to the ways in which [Ungarean]

materially utilized [his] property and physical space. … Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused [Ungarean], and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time. Thus, the spread of COVID-19 did not, as [CNA] contend[s], merely impose economic limitations. Any economic losses were secondary to the businesses' *physical* losses.

Trial Court Opinion, 3/25/21, at 13-14 (emphasis and some ellipses in original, footnotes citing Merriam-Webster Dictionary for definitions of terms omitted).

We agree with the trial court that it is, at a minimum, reasonable to find that Ungarean's loss of the use of his dental practice due to COVID-19 and the governmental orders equated to a direct physical loss of his property. ***See*** ***Collister***, 388 A.2d at 1353; ***Consol. Rail Corp.***, 182 A.3d at 1026. In fact, to say otherwise not only ignores the reality of the impact COVID-19 had on businesses and the world at large but ignores the dictionary definitions of the words in the CNA Policy which, as written, reasonably encompass the direct physical loss of the use of one's property due to COVID-19 and the physical restrictions placed on properties because of it.[3]

_____

[3] Although not applicable here, another way insureds may demonstrate that they have satisfied the "direct physical loss or damage" to covered property is by invoking the contamination theory so aptly explained by another well-reasoned trial court opinion in ***SWB Yankees v. CNA Fin. Corp.***, 2021 WL 3468995 (Lackawanna Ct. Com. Pl. August 4, 2021). There, the court explained that if an insured alleges the actual presence of COVID-19 on its property caused the property to become uninhabitable or unusable, it has "adequately alleged 'physical loss or damage' to its property under the contamination theory for purposes of business interruption insurance coverage. ***Id.*** at *21. Ungarean did not allege that COVID-19 was present in his dental practice.

- 11 -

Period of Restoration

CNA points out, however, that the Business Income and Extra Expense provisions state that CNA will pay for actual loss or reasonable and necessary expenses during the "period of restoration." CNA asserts the definition of "period of restoration" in the policy only lends support to its argument that "physical loss or damage" requires a physical alteration to the property and because that did not happen here, Ungarean did not suffer a direct physical loss of his dental practice. The policy defines "period of restoration" as:

> the period of time that … [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and … [e]nd on the earlier of … [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or … [t]he date when business is resumed at a new permanent location.
>
> Period of restoration does not include any increased period required due to the enforcement of any law that … [regulates the construction, use or repair, or requires the tearing down of any property ; or … [r]egulates the prevention, control, repair, clean-up or restoration of environmental damage.
>
> The expiration date of this policy will not cut short the "period of restoration."

CNA Policy, Businessowners Special Property Coverage Form, at G.20.

In rejecting CNA's argument, the trial court concluded that the "period of restoration" provisions are most reasonably construed as time limits for coverage, and do not otherwise alter the definition of "physical loss or damage." **See** Trial Court Opinion, 3/25/21, at 15. We agree and are therefore unpersuaded by CNA's argument that the definition of "period of restoration"

should somehow alter our conclusion that Ungarean suffered a physical loss to his dental practice and is consequently entitled to coverage.[4]

<u>"Covered Cause of Loss"</u>

This does not, however, end our analysis as the CNA Policy also states that "[t]he loss or damage must be caused by or result from a Covered Cause of Loss." CNA Policy, Business Income and Extra Expense Endorsement, at 1.b.; *see also id.* at 2.a. ("Extra Expense means reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss."). The CNA Policy defines "Covered Causes of Loss" as follows: "RISKS OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in section B. EXCLUSIONS; b. Limited in paragraph A.4. Limitations; or c. Excluded or limited by other provisions of this policy." CNA Policy, Businessowners Special Property Coverage Form, at A.3. (emphasis in original).

Here, CNA does not raise any argument related to Paragraph A.4 or indicate that the loss was excluded or limited under other provisions of the CNA Policy. Instead, CNA points to a variety of exclusions in Section B of the

---

[4] Furthermore, as the trial court noted, COVID-19 has necessitated many physical changes to business properties that would constitute repairs or rebuilding. *See id.* at 15-16. "Such changes include, but are not limited to, the installations of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems." *Id*. at 15.

CNA Policy and maintains each of these exclusions relieves it of any obligation to cover Ungarean's lost business income and extra expenses from the pandemic-related loss of his dental practice. These exclusions include contamination; consequential loss; fungi, wet rot, dry rot, and microbes; ordinance or law; government actions; and acts or decisions.

It is well settled that when the insurer relies upon exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case. *See McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa. Super. 2013) (stating that the insured has the initial burden of showing a claim falls within a policy's coverage, but the burden then shifts to the insurer to prove the applicability of any exclusions); *Wagner*, 801 A.2d at 1231 (providing that the insurer must show that an asserted exclusion clearly and unambiguously prevents the coverage of a claim). To sustain that burden, CNA "must prove that the language of the insurance contract is clear and unambiguous; otherwise, the provision will be construed in favor of the insured." *Wagner*, 801 A.2d at 1231. Importantly, insurance coverage is interpreted broadly to afford the greatest possible protection to the insured; concomitantly, exclusionary clauses are interpreted narrowly against the insurer. *See Kropa v. Gateway Ford*, 974 A.2d 502, 505-07 (Pa. Super. 2009); *Pecorara v. Erie Ins. Exch.*, 596 A.2d 237, 239 (Pa. Super. 1991).

<u>Ambiguity in Exclusions Provisions</u>

As a preliminary matter, the parties acknowledge that Ungarean seeks coverage under the CNA Policy's Business Income and Extra Expense provisions. The CNA Policy's stated exclusions include four distinct categories of exclusions. *See* CNA Policy, Businessowners Special Property Coverage Form, at B.1.-4. CNA cites to exclusions in the first three categories and wholly ignores that the fourth category expressly limits its application to "Business Income and Extra Expense Exclusions." *Id.* at B.4.

As noted above, when a claim is made under the CNA Policy, coverage under the Business Income and Extra Expense insurance is restricted to situations where "[t]he loss or damage [is] caused by or result from a Covered Cause of Loss." CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2.a. "Covered Cause of Loss" broadly cites to Section B. (Exclusions) and does not differentiate between the four categories of Exclusions. *See* CNA Policy, Businessowners Special Property Coverage Form, at A.3.

However, based upon the language in the CNA Policy, an insured, such as Ungarean, could reasonably conclude that the Business Income and Extra Expense Exclusions, as stated in the fourth category, and not the first three categories of exclusions, are the only exclusions which apply to claims under the Business Income and Extra Expense coverage provisions. CNA's contention that all four of the categories of exclusions apply to claims for Business Income and Extra Expense insurance, based upon the definition of "Covered Cause of Loss" and its broad statement citing to Section B.

(Exclusions) as a whole, is unreasonable when considering the express words of the policy. In fact, CNA's interpretation would mean that the inclusion of the words "Business Income and Extra Expense Exclusions" in the CNA Policy was entirely superfluous, amounting to no more than mere surplusage. **See** CNA Policy, Businessowners Special Property Coverage Form, at B.1.-4; **Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.**, 941 A.2d 706, 716 (Pa. Super. 2007) (stating that when courts must choose between two competing interpretations of an insurance policy, "we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the policy's language). Such inconsistent language used in relation to different identified forms of exclusions, covered under different provisions of the CNA Policy, necessarily creates an ambiguity in the policy. **See Bishops, Inc. v. Penn Nat. Ins.**, 984 A.2d 982, 992 (Pa. Super. 2009) (finding an ambiguity in an insurance policy based upon contradictory or necessarily inconsistent language in different portions of the policy).

Here, Ungarean purchased the CNA Policy, which provided him with two categories of property insurance—Businessowners Covered Property insurance and Business Income and Extra Expense insurance. Ostensibly, if Ungarean sought coverage under the Businessowners Covered Property insurance, the first three categories of Exclusions would be applicable, but by the plain language of the CNA Policy, the "Business Income and Extra Expense Exclusions" would be inapplicable. Moreover, only with the inclusion of a claim

for loss of business income would the fourth category of exclusions — "Business Income and Extra Expense Exclusions"— be triggered.

When insurance policy language is ambiguous, courts examine whether a finding of coverage is consistent with the objectively reasonable expectations of the insured. *See id.* at 990. In making this determination, courts must examine the totality of the disputed policy language. *See id.*

When viewing the CNA Policy as a whole, and keeping in mind that we must interpret the relevant provisions in favor of the insured and read the exclusionary clauses narrowly against the insurer, we find that the only exclusion applicable to Ungarean's Business Income and Extra Expense insurance claim is the provision for "Business Income and Extra Expense Exclusions".[5]

The CNA Policy defines "Business Income and Extra Expense Exclusions" as follows:

a. We will not pay for:

(1) Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

---

[5] Although neither party cites to this exclusion, it is well settled that the insurer bears the burden to establish the applicability of any exclusion to deny coverage. *See McEwing*, 77 A.3d at 646.

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

b. Any other consequential loss.

CNA Policy, Businessowners Special Property Coverage Form, at B.4.

Here, subsection a. is clearly inapplicable to the facts of this case. Regarding subsection b. — "Any other consequential loss"— the CNA Policy in a separate exclusion defines "consequential loss" as "[d]elay, loss of use or loss of market." CNA Policy, Businessowners Special Property Coverage Form, at B.2.b.

If we were to find that subsection b. of the "Business Income and Extra Expense Exclusions" is applicable to this case, we would necessarily vitiate Business Income and Extra Expense coverage *in its entirety*. **See** Trial Court Opinion, 3/25/21, at 28. Here, as explained above, the CNA Policy can reasonably be interpreted to find that the "loss of property" includes the act of being deprived of the physical use of one's property. Accordingly, the consequential loss exclusion "would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril." **Id.** Given this result, we cannot conclude that the exclusion for consequential loss under the "Business Income and Extra Expense Exclusions" is applicable so as to prevent coverage.

Based on all of the above, we find that the loss in this case is a "Covered Cause of Loss" as specified in the CNA Policy as none of the exclusions in the

Business Income and Extra Expenses Exclusions category, the only category of Exclusions available to CNA for the Business Income and Extra Expense claim made here, is applicable.

Other Exclusions Under Section B

Nevertheless, even if we were to address CNA's arguments regarding the exclusions in the first three categories of Section B. (Exclusions), we agree with the trial court that none of the cited exclusions apply. First, CNA argues the "Contamination by other than pollutants" exclusion applies to the instant case. *See* Brief for Appellant at 38-39. CNA contends this exclusion applies to any loss resulting from contamination, including mitigation efforts. *See id.* at 38. CNA claims that the losses here are an "indirect" result of COVID-19 contamination. *See id.* at 39.

The contamination exclusion in the CNA Policy precludes coverage for "Contamination by other than pollutants." CNA Policy, Businessowners Special Property Coverage Form, at B.2.d.8. In turn, the CNA Policy defines "pollutants" as follows:

> any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthy or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste included material to be recycled, reconditioned, or reclaimed.

*Id.*, at G.21.

As an initial matter, the contamination exclusion contains an ambiguity, given that it seeks to exclude pollutants while at the same time including

"contaminant" in the definition of pollutants. *See Wagner*, 801 A.2d at 1231 (stating that an ambiguity in the insurance policy must be construed against the insurer). However, setting aside this ambiguity, we agree with the trial court that this exclusion does not apply, and adopt its reasoning supporting that conclusion in full. *See* Trial Court Opinion, 3/25/21, at 21-24. Furthermore, CNA has not established, through any pertinent case law, that an "indirect" connection between the exclusion and the loss renders the exclusion applicable. As noted above, Ungarean neither alleged nor introduced evidence that the COVID-19 virus was present at the dental offices. Accordingly, we reject CNA's contention that the "Contamination by other than pollutants" exclusion prevents coverage of Ungarean's claim.

Next, CNA argues that the consequential loss exclusion applies. *See* Brief for Appellant at 39-41. CNA claims the trial court misinterpreted this exclusion by finding that the exclusion would render the Business Income and Extra Expense coverages illusory. *See id.* at 39-40. To that end, CNA contends that when the trigger for coverage includes a tangible change to the property, and not mere loss of use, the exclusion is not illusory and reinforces its position that a "non-tangible loss of use was never intended to be covered under the policy." *Id.* at 40. In support, CNA cites to various cases interpreting similar language. *See id.* at 40-41.

Given that we have rejected CNA's underlying argument that Ungarean did not suffer a direct physical loss to his dental practices, we likewise reject

this contention which is premised on that underlying argument. Moreover, we do not find any of the cases cited by CNA to be availing, as the "loss of property" language in the CNA Policy, unlike the policies in the cited cases, includes the act of being deprived of the physical use of one's property. Therefore, we also find that the consequential loss exclusion is not applicable.

Next, CNA contends that the "fungi, wet rot, dry rot, and microbes" exclusion applies to this case. *See* Brief for Appellant at 42-43. CNA argues that the trial court's interpretation of the exclusion is tortured and manufactures an ambiguity. *See id.*

We disagree. To the contrary, we agree with the trial court that the exclusion does not apply to the facts of this case and adopt its analysis in full. *See* Trial Court Opinion, 3/25/21, at 24-26. We add that CNA's argument that the trial court manufactured an ambiguity is without merit, given that the CNA Policy defines "microbe" but fails to include *virus* in this definition. *See* *Wagner*, 801 A.2d at 1231 (stating that when construing an insurance policy, courts must construe words of common usage in their natural, plain, and ordinary sense and may inform the understanding of these terms by accounting for their dictionary definitions).[6] Based upon the foregoing, CNA has not met its burden of establishing that this exclusion is applicable.

_____

[6] The CNA Policy at issue here does not contain a virus exclusion. If it had, such an exclusion would most likely have ended our inquiry and compelled a conclusion different from the one reached by the trial court and affirmed by this Court.

- 21 -

CNA also attempts to invoke the "Ordinance or Law" exclusion. ***See*** Brief for Appellant at 44-45. CNA asserts that Governor Wolf's COVID-19 orders had the force of law and exclude coverage under that exclusion. ***See id.***

The exclusion states the following:

a. Ordinance or Law

(1)    The enforcement of any ordinance or law:

  (a)    Regulating the construction, use or repair of any property; or

  (b)    Requiring the tearing down of any property, including the cost of removing its debris.

(2)    This exclusion applies whether the loss results from:

  (a)    An ordinance or law that is enforced even if the property has not been damaged; or

  (b)    The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

CNA Policy, Businessowners Special Property Coverage Form, at 1.a.

The inclusion of "construction" and "repair" with "use" indicates "that the exclusion relates to the physical structural integrity of the property." ***Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.***, 516 F. Supp. 3d 450, 461 (E.D. Pa. 2021); ***see also Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.***, 506 F. Supp. 3d 360, 380 (E.D. Va. 2020) ("[I]t is clear that the Ordinance or law Exclusion applies to ordinances related to the structural integrity, maintenance, construction, or accessibility due to the

- 22 -

property's physical structural state, which existed *before*.") (emphasis in original).[7] Here, the physical structural integrity of the properties is not at issue and, thus, the narrow application of this exclusion is unavailable to CNA.

In any event, even if CNA could establish that "use" in the exclusion applies to this case, we agree with the trial court that Ungarean's claim "for coverage is based upon losses and expenses [he] suffered in relation to both 'the Covid-19 pandemic and the actions of the government in response thereto.'" Trial Court Opinion, 3/25/21, at 29 (emphasis omitted). It was "COVID-19 and the related social distancing measures (with or without government orders) [which] directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time." *Id.* Accordingly, the Ordinance or Law exclusion is not available to CNA on this basis as well.

Finally, CNA baldly raises a claim that the Acts or Decisions and Governmental Actions exclusions are applicable. *See* Brief for Appellant at 44.

The Acts or Decisions exclusion states that the insurer "will not pay for loss or damage caused by or resulting from … acts or decisions, including the failure to act or decide, of any person, group, organization or governmental

---

[7] Such an interpretation is seemingly confirmed by the "Ordinance or Law" endorsement, which states that "[t]he ordinance or law referred to in this Additional Coverage is an ordinance or law that … [r]egulates the demolition, construction or repair of buildings, or establishes zoning or **land use** requirements at the described premises; and … [i]s in force at the time of the loss." CNA Policy, Ordinance or Law, at 2 (emphasis added).

body." CNA Policy, Businessowners Special Property Coverage Form, at B.3.b. Pertinently, if the excluded cause of loss listed in paragraph b. "results in a Covered Cause of Loss, [CNA] will pay for the loss or damage caused by that Covered Cause of Loss." *Id.*

The plain language of this exclusion conflicts with the definition of Covered Cause of Loss. As noted above, the CNA Policy defines "Covered Causes of Loss" as follows:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
> a. Excluded in section B. EXCLUSIONS;
> b. Limited in paragraph A.4. Limitations; or
> c. Excluded or limited by other provisions of this policy.

*Id.*, at A.3. By the plain language of the CNA Policy, a loss cannot be a Covered Cause of Loss if an exclusion in Section B. applies. However, the Acts or Decisions exclusion will cover an excluded loss if the loss is a Covered Cause of Loss. These two sections are in conflict, as a loss excluded by the Acts or Decisions exclusion would never qualify as a Covered Cause of Loss. Accordingly, the exclusion contains an ambiguity and therefore cannot be used by CNA to deny Ungarean coverage.

Moreover, the Governmental Actions exclusion denies coverage for "loss or damage caused directly or indirectly by … destruction of property by order of government authority." *Id.*, at B.1.c. Here, the Governmental Actions exclusion does not apply because no governmental authority ordered the destruction of Ungarean's properties.

In sum, as for the exclusions, we find in the first instance that the ambiguity created by Section B. Exclusions means only the fourth category of exclusions, under the heading of "Business Income and Extra Expense Exclusions," is available for CNA to invoke against Ungarean's claim under the Business Income and Extra Expense provisions. None of those exclusions are applicable to Ungarean's claim. Nonetheless, even if the exclusions under the three other Exclusions sections not labeled "Business Income and Extra Expense Exclusions" were available to CNA, we agree with the trial court that those exclusions are also not applicable and cannot absolve CNA of its responsibility to provide coverage for Ungarean's losses.

Therefore, we conclude that the trial court properly declared that CNA was obligated to provide business loss and extra expenses coverage to Ungarean for the direct physical loss of his dental practice that he suffered due to COVID-19 and the governmental orders issued in response to the pandemic.

<u>Civil Authority Provision</u>

The trial court also found that Ungarean was entitled to coverage under the Civil Authority Provision in the CNA Policy, which states:

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

CNA Policy, Civil Authority, at 1.

As we agree with the trial court that Ungarean has established a claim that he suffered a "physical loss of or damage to covered property," we also agree with the trial court that he has established a claim under the Civil Authority Endorsement. ***See*** Trial Court Opinion, 3/25/21, at 19-20.

<u>Conclusion</u>

We affirm the trial court's order granting Ungarean's motion for summary judgment and its declaration that Ungarean's direct physical loss to his dental practice is covered by the CNA Policy. We recognize, as CNA has taken great pains to point out, that this conclusion runs against the tide of cases finding an insured was not owed COVID-related business interruption coverage under their policy's provisions. However, as we stressed above, our review must be confined to the CNA policy purchased by Ungarean to determine whether coverage has been triggered. We base our finding that coverage has indeed been triggered on the plain language of the CNA policy, the guiding principle that ambiguities in insurance policies such as the ones we identified in the CNA Policy must be construed in favor of the insured, and the analysis and opinion of the trial court.

Order affirmed.

Judges Lazarus, Kunselman, Nichols, and McLaughlin join the Opinion.

Judge Stabile files a dissenting opinion in which President Judge Emeritus Bender, and Judges Bowes and King join.

J-E01002-22

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/30/2022

Filed 5/5/2021 12:45:14 PM Superior Court Western District
490 WDA 2021

# Exhibit B

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

TIMOTHY A. UNGAREAN, DMD d/b/a
SMILE SAVERS DENTISTRY, PC,
INDIVIDUALLY AND ON BEHALF OF
A CLASS OF SIMILARLY SITUATED
PERSONS,

                Plaintiff,

        v.

CNA and VALLEY FORGE INSURANCE
COMPANY,

                Defendants.

:    CIVIL DIVISION
:
:
:
:    No.: GD-20-006544
:
:
:
:
:    **Memorandum and Order of Court**
:
:
:
:
:
:
:

*Counsel for Plaintiff:*
John P. Goodrich, Esquire
Lauren R. Nichols, Esquire
429 Fourth Ave.
Suite 900 Pittsburgh, PA 15219

Scott B. Cooper, Esquire
209 State Street
Harrisburg, PA 17101

James C. Haggerty, Esquire
1835 Market Street
Suite 2700 Philadelphia, PA 19103

Jonathan Shub, Esquire
Kevin Laukaitis, Esquire
134 Kings Highway East
2nd Floor Haddonfield, NJ 08033

*Counsel for Defendants:*
Robert M. Runyon III, Esquire
Daniel J. Grossman, Esquire
400 Maryland Drive
Fort Washington, PA 19034

William Pietragallo II, Esquire
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219


FILED
2021 MAR 25 PM 3:33
DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

1

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Memorandum and Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER OF COURT

### I.     The Parties

Timothy A. Ungarean, DMD, d/b/a Smile Savers Dentistry, PC is a dentist who owns and operates a dental practice with places of business located at 4701 Baptist Road, Pittsburgh, Allegheny County, Pennsylvania, 15227 and 3153 Brodhead Road, Suite A, Aliquippa, Beaver County, Pennsylvania, 15001. Timothy A. Ungarean, DMD, is hereinafter referred to as "Ungarean" or "Plaintiff."

CNA is a property and casualty insurance company with a principal place of business at 151 North Franklin Street, Floor 9, Chicago, Illinois 60606.[1] Valley Forge Insurance Company

---

[1] In their Cross Motions for Summary Judgment, both Valley Forge Insurance Company and CNA argue that CNA is not a proper party in this action. This Court disagrees. After Plaintiff filed its claim with Valley Forge Insurance Company, Plaintiff received a letter that Plaintiff is not entitled to coverage. Plaintiff's Complaint at 174, Exhibit C. Importantly, the letter is written by a Mark Chancellor, who identifies himself as a Claims Representative with CNA. In the letter, Mark Chancellor speaks on behalf of Valley Forge Insurance Company and specifically states that "*[w]e* have evaluated the claim under a CNA Connect Policy issued to Timothy A Ungarean by VFIC . . . Policy No. 6025183026 (the "Policy")." *Id.* at 175, Exhibit C (emphasis added). Given that the initial denial letter came from a CNA Claims Representative, this Court determined that CNA is a proper party in this declaratory judgment action. *See Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 573 (Pa. Super. 1997) (holding that "courts will disregard the corporate entity only in the limited

2

is a wholly owned subsidiary company of CNA, and also provides property and casualty insurance. Both CNA and Valley Forge Insurance Company regularly and routinely conduct business in the Commonwealth of Pennsylvania. CNA and Valley Forge Insurance Company are hereinafter collectively referred to as "Defendants."

## II. Introduction

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders"). On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency. On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations. On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home. As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[2] Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[3]

---

circumstances when *used to defeat public convenience*, justify wrong, protect fraud or defend a crime") (emphasis added).

[2] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[3] As of March 21, 2021, 843,135 citizens of Pennsylvania have contracted COVID-19 and 24,788 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff shutdown the majority of its business operations. For a time, Plaintiff's dental practice remained open only to perform emergency dental procedures. Not surprisingly, Plaintiff subsequently experienced a dramatic decrease in business income and furloughed some of its employees. Plaintiff thereafter submitted a claim for coverage under its business insurance policy ("the insurance contract") with Defendants. Defendants denied Plaintiff's claim.

On June 5, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted one count for declaratory judgment, by which it seeks this Court's determination as to whether Plaintiff is entitled to coverage under the insurance contract with Defendants for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders. On October 5, 2020, Plaintiff filed a Motion for Summary Judgment. On December 2 and December 4, 2020, Defendants filed Cross Motions for Summary Judgment. On January 20, 2020, this Court heard oral argument on Plaintiff's Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment. For the reasons set forth herein, this Court grants Plaintiff's Motion for Summary Judgment and denies Defendants' Cross Motions for Summary Judgment.

### III.    The Contract Provisions

Plaintiff's and Defendants' dispute involves the following provisions regarding coverage under the insurance contract.

**Business Income**

    a.  Business Income means:
           (1) Net Income (Net profit or Loss before Income taxes) that
                would have been earned or incurred, including:
                a.  "Rental Value;" and
                b.  "Maintenance Fees," if you are a condominium
                   association; and

4

(2) Continuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[4]

**Extra Expense**

a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b. We will pay Extra Expense (other than the expense to repair or replace property) to:
(1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or
(2) Minimize the "suspension" of business if you cannot continue "operations."

c. We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph 1. Business Income above.

Plaintiff's Complaint, at 58-59, Exhibit B (emphasis added).

---

[4] The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable." Plaintiff's Complaint at 55. The insurance contract defines "operations" as "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Plaintiff's Complaint at 53. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Plaintiff's Complaint at 53. The insurance contract defines Covered Cause of Loss as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy. Plaintiff's Complaint at 37.

5

**Civil Authority**

1. When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by an action of civil authority that prohibits access to the described premises. *The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.*

*Id.* at 84 (emphasis added).

Plaintiff's and Defendants' dispute also involves the following provisions regarding exclusions from coverage under the insurance contract:

**Exclusions**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Ordinance or Law**

(1) The enforcement of any ordinance or law:
    (a) Regulating the construction, use or repair of any property; or
    (b) Requiring the tearing down of any property, including the cost of removing debris.

(2) This exclusion applies whether the loss results from:
    (a) An ordinance or law that is enforced even if the property has not been damaged; or
    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

**Contamination**

Contamination by other than "pollutants."[5]

---

[5] The insurance contract defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste includes materials to be recycled, reconditioned or reclaimed." Plaintiff's Complaint at 54.

**Consequential Loss**

> Delay, loss of use or loss of market.

**Acts or Decisions**

> Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body.

*Id.* at 38-42 (emphasis added).

### Fungi, Wet Rot, Dry Rot and Microbes[6]

*Id.* at 118-19 (emphasis added).

## IV.   Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2. Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013). Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment. *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

---

[6] "Microbe(s)" is specifically defined in the following manner:

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 118-19 (emphasis added).

(Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous. *Id.* "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## V.    Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendants bear "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendants must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will

8

be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Business Income and Extra Expense provisions of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus. With regard to Business Income and Extra Expense coverage, the insurance contract provides that:

> a. Business Income means: (1) [n]et income (Net Profit or Loss before Income taxes) that would have been earned or incurred . . . and (2) [c]ontinuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

> b. [the insurer] will pay for the actual loss of Business Income you [the insured] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Plaintiff's Complaint, at 58, Exhibit B.

*     *     *     *     *

> a. Extra Expense means reasonable and necessary expenses you [the insured] incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

> b. [the insurer] will pay Extra Expense (other than to repair or replace property) to: (1) [a]void or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (2) [m]inimize the "suspension" of business if you cannot continue "operations."

> c. [the insurer] will also pay any Extra Expense (including Expediting Expenses) to repair or replace property, but only to the extent it reduces the amount of loss

9

that otherwise would have been payable under [the above Business Income provision].

*Id.* at 59, Exhibit B.

The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable," and "operations" means "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." *Id.* at 53-55, Exhibit B. The insurance contract defines "period of restoration" as:

> the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location.

*Id.* at 53, Exhibit B. Additionally, "Covered Cause of Loss" is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id.* at 37, Exhibit B.

In order to state a reasonable claim for coverage under the Business Income and Extra Expense provisions of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to property" is the key point of the parties' dispute.[7] Defendants contend that "direct

---

[7] The parties do not dispute whether Plaintiff's business operations were at least partially suspended or interfered with due to COVID-19 and/or the government orders. The parties mainly contend whether Plaintiff's loss of use of its property entitles Plaintiff to coverage. The dispositive question with regard to whether Plaintiff is entitled to coverage for Business Income and Extra Expense is whether Plaintiff suffered a "direct physical loss of or damage to" Plaintiff's property. To the extent the parties disagree as to the meaning of the "period of restoration," and the potential impact of this phrase on the meaning of "direct physical loss of or damage to" Plaintiff's property, this Court addresses this issue in the body of this memorandum, after this Court's discussion of the phrase "direct physical loss of or damage to property."

10

physical loss of or damage to property" requires some physical altercation of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical altercation of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property. Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define the phrase "direct physical loss of or damage to property." As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Construction Company,* 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9] "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

11

ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to property" as requiring some form of physical altercation and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in the contract by the disjunctive "or."[12] It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA,* 83 A.3d 418, 420-21 (Pa. Super. 2013). Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical loss of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage." This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language. As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange,* 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

12

"DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical." Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural

---

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.
[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

13

science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16] Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical." The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and physical space. *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added). Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time. Thus, thehe spread of COVID-19 did not, as Defendant's contend, merely impose economic limitations. Any economic losses were secondary to the businesses' *physical* losses.

While Defendants are of course correct to point out that the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to property" requires actual harm to Plaintiff's property in every instance. Any argument that the terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding

---

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

14

the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase " direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendants also contend that the insurance contract's definition for "period of restoration" suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff's to be entitled to Business Income and Extra Expense coverage. The insurance contract states that the insurer "will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary "suspension" of . . . "operations" during the "period of restoration." Plaintiff's Complaint at 58, Exhibit B. The "period of restoration" begins at the time the direct physical loss of or damage to property occurs and ends on the date when the premises "should be repaired, rebuilt, or replaced with reasonable speed and similar quality . . . or . . . when the business is resumed at a new location." *Id.* at 53, Exhibit B. Specifically, Defendants argue that, without actual tangible damage, there is no period of restoration because there is no need for the property to be repaired, rebuilt, or replaced, and Plaintiff has no plans to resume the business at a new location.

Although this Court agrees with Defendants on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the definition for "period of restoration" is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of damage. Indeed, the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth. Such changes include, but are not limited to, the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems. These changes would undoubtably

15

constitute "repairs" or "rebuilding" of property. *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 23 (stating that the installation of partitions and particular ventilations systems constitute "repairs" consistent with the period of restoration). Additionally, in order to "replace" or "rebuild" unused space due to social distancing protocols, businesses might choose to buildout new spaces, move to larger spaces, or rearrange existing spaces in order to increase the amount of business they can safely handle during these difficult times.

Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on available coverage, which ends whenever such measures, if undertaken, would have been completed with reasonable speed and similar quality. To put this another way, the "period of restoration" ends when Plaintiff's business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place further substantive limits on types of available coverage. Defendants cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, Plaintiff reasonably established a

16

right to coverage under the Business Income and Extra Expense provisions of the insurance contract.[17]

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus. With regard to Civil Authority coverage, the insurance contract provides that:

> 1. When the Declarations show that [the insured has] coverage for Business Income and Extra Expense, [the insured] may extend that insurance to apply to the actual loss of Business Income [the insured] sustain[s] and reasonable and necessary Extra Expense [the insured] incur[s] caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

Plaintiff's Complaint at 84, Exhibit B (emphasis added).

Thus, in order to state a reasonable claim of coverage under the Civil Authority provision of the insurance contract, Plaintiff must reasonably demonstrate both of the following: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the

---

[17] This Court is aware that the insurance contract provides that any "direct physical loss of or damage to property" must be caused by a Covered Cause of Loss. However, Covered Cause of Loss is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id.* at 37, Exhibit B. Admittedly, this Court was somewhat perplexed by this definition. One would think that in defining Covered Causes of Loss the contract would state, either specifically or more generally, covered causes of loss, i.e. fire, tornado, hurricane, lightening, etc.. Here, the contract's language instead turns back on itself and states that "direct physical loss of or damage to property" must be caused by "RISK OF DIRECT PHYSICAL LOSS unless the loss is . . . Excluded . . . ." Given that this insurance contract is an "All Risk" insurance policy that is meant to cover any losses, damages, and expenses to the insured's premises unless specifically excluded, this Court determined it is reasonable to interpret Covered Cause of Loss in a manner that does not further limit the scope of coverage beyond any instance that amounts to a "direct physical loss of or damage to property," which is not otherwise excluded. Accordingly, this Court determined that as long as the spread of COVID-19 caused "direct physical loss of or damage to property," and does not fall within the ambit of one of the contract's exclusions, it is reasonable to interpret the contract as entitling Plaintiff to coverage. This same analysis regarding the term Covered Cause of Loss applies equally in the context of the contract's provision regarding Civil Authority coverage. Thus, this Court need not address Covered Cause of Loss again separately.

17

"direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property.

Defendants contend that Plaintiff is not entitled to coverage under the Civil Authority provision of the contract because the Governor's orders did not completely prohibit Plaintiff from accessing its property. According to Defendants, although the Governor's orders closed Plaintiff's property to the majority of the general public, Plaintiff is nonetheless precluded from coverage under the Civil Authority provision of the insurance contract because Plaintiff and Plaintiff's employees were still able to access Plaintiff's property in order to conduct emergency procedures. Defendants also argue, just as they did with regard to the Business Income and Extra Expense coverage provisions, that any actions taken by civil authorities in response to COVID-19 were not caused by "direct physical loss of or damage to" property at any location. In contrast, Plaintiff contends that, because the Governor's orders prohibited Plaintiff from operating its business except in cases of emergency, and because the Governor's orders directed citizens of the Commonwealth to stay at home, the Governor's orders effectively prohibited meaningful access to Plaintiff's property. Additionally, Plaintiff argues that COVID-19 caused "direct physical loss of or damage to" property across the Commonwealth just as it did with regard to Plaintiff's property.

As to whether the spread of the COVID-19 virus caused "direct physical loss of or damage to" property, the same analysis that this Court applied with regard to Plaintiff's property also applies to other property as well. Even absent any damage to property, the spread of COVID-19 has resulted in a serious public health crisis, which has directly and physically caused the loss of use of property all across the Commonwealth. Again, this is evident because COVID-19 and the related social distancing measures (with and without government orders) directly

18

forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time in a safe and responsible manner. This Court's conclusion that other property was impacted by COVID-19 is supported by the Supreme Court of Pennsylvania. In *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 890 (Pa. 2020), our Supreme Court clarified that the COVID-19 virus qualifies as a natural disaster, and, given the nature of the manner in which COVID-19 spreads, Governor Wolf "had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area."[18]

With regard to whether "an action of civil authority . . . prohibit[ed] access" to Plaintiff's property, this Court determined that the phrase "prohibits access" may reasonably be interpreted to encompass the instant situation. The term "prohibit" is defined as "to forbid by authority [and/or] to prevent from doing something . . . ."[19] Here, the Governor's emergency orders did exactly that. The Governor's orders directed individuals to stay home and required businesses to essentially close their doors absent emergencies and/or the need to conduct life sustaining operations. Although Plaintiff's business (a dental practice) was technically permitted to remain open to conduct certain limited emergency procedures, this does not change the fact that an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing Plaintiff's business in any meaningful way for normal, non-emergency procedures; procedures that likely yeild a significant portion of Plaintiff's business income.

---

[18] In its opinion upholding the Governor Wolf's use of the Emergency Code to shutdown businesses throughout the Commonwealth, the Supreme Court of Pennsylvania explained that, as of April 8, 2020, confirmed cases of COVID-19 had been reported in every single county in the Commonwealth, and "*any location where two or more people can congregate is within the disaster area.*" *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (emphasis added). The Supreme Court of Pennsylvania reached this conclusion because "[t]he virus spreads *primarily through person-to-person contact*, has an incubation period of up to fourteen days, one in four carriers are asymptomatic, and the virus can live on surfaces for up to four days." *Id.* at 889 (emphasis added).

[19] Prohibit, Merriam-Webster, https://www.merriam-webster.com/dictionary/prohibit.

This Court is not persuaded by Defendant's argument that, in order to be entitled to Civil Authority coverage, the action of civil authority must be a complete and total prohibition of all access to Plaintiff's property by any person for any reason. If this Court were to accept Defendant's cramped interpretation of the phrase "prohibits access," it would result in businesses being precluded from coverage in nearly every instance where an action of civil authority effectively closes the business to the vast majority of the general public, but does not necessarily preclude employees, or certain other individuals, from entering the premises to clean, maintain the building, obtain important documents, or to perform other similar functions, which, while important, remain secondary to the activities that actually generate business income.

Once again this Court notes the importance of reading the insurance contract's provisions as a whole so that all of its parts fit together. In so doing, this Court recognizes that the insurance contract provisions at issue are generally designed to provide business owners with coverage for lost busines *income* in the event that their business' operations are suspended. Accordingly, this Court's primary focus when interpreting the phrase "prohibits access," at least in the context of this insurance contract, is the extent to which the action of civil authority prevented the insured from accessing its premises in a manner that would normally produce actual and regular business income. Given this understanding of the insurance contract, the fact that some employees, and even some limited number of patients, were still permitted to go to Plaintiff's property for emergency procedures does not necessarily mean that Plaintiff is altogether precluded from coverage under the Civil Authority provision. The contract merely requires that "an action of civil authority . . . prohibits access to" Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar *all* persons from *any* form of access to Plaintiff's property whatsoever.

20

As this Court determined that Plaintiff provided a reasonable interpretation that: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the "direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property, this Court concluded that Plaintiff established a right to coverage under the Civil Authority provision of the contract.

### b. Exclusions

Having determined that Plaintiff provided reasonable interpretations demonstrating that there is coverage under the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract, this Court turns to the question of whether Defendants demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendants must show that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

This Court starts by addressing the exclusion for Contamination. With regard to this exclusion, the insurance contract provides that "[the insurer] will not pay for loss or damage caused directly or indirectly by any of the following . . . [c]ontamination by other than "pollutants." Plaintiff's Complaint at 41, Exhibit B. Because the insurance contract does not define the term contamination, this Court looks to the word's natural, plain, and ordinary meaning, and informs its understanding of this term by considering its dictionary definition. *Madison Construction Company*, 735 A.2d at 108.

Merriam-Webster defines contamination as "the process of contaminating [and/or] the state of being contaminated."[20] Additionally, in *Raybestos-Manhattan, Inc. v. Industrial Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. 1981), the Superior Court of Pennsylvania clarified that:

> Contamination connotes a condition of impurity resulting from mixture or contact with a foreign substance . . . [and] the word contaminate is defined as . . . to render unfit for use by the introduction of unwholesome or undesirable elements . . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.

This Court recognizes that the above-described common and ordinary definitions of the terms contamination and contaminate are considerably broad. However, in determining whether the contamination exclusion applies clearly and unambiguously to the loss of use of property due to social distancing measures designed to prevent the spread of COVID-19, this Court acknowledges that the question is not whether the definition of contamination is so broad that virtually anything could come within its ambit. *Madison Construction Co.*, 735 A.2d at 607. Instead, this Court is "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.*

Based upon the above dictionary definitions, the contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, i.e., property, and destroys the object's purity. Accordingly, if the specific cause of the loss of use of property was COVID-19 contacting objects, and destroying the objects' purity, then the insurance contract's contamination exclusion might prevent coverage. However, based upon the particular facts of this case, and considering the primary means by which COVID-19 spreads, the cause for the loss of use of property was *not* the contamination of property. Rather, the cause of the loss of use of property was the risk of person-to-person transmission of COVID-19, which necessitated

---

[20] Contamination, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination.

22

social distancing measures and fundamentally changed the way businesses utilized physical space (property).

The Supreme Court's recent decision in *Friends of Danny DeVito* supports the above conclusion. In rejecting the argument that actual contamination of specific property was necessary in order to justify Governor Wolf's orders restricting business operations throughout the Commonwealth, the Supreme Court of Pennsylvania elucidated that arguments regarding the dangers of COVID-19 contaminating property misunderstand the primary means by which COVID-19 spreads. *Id.* at 892. Specifically, the Supreme Court of Pennsylvania clarified that "COVID-19 does not spread because the virus is *at* a particular location . . . [i]nstead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers are asymptomatic. *Id.* (emphasis in original).

Although it is contested whether COVID-19 can live on the surfaces of property for some period of time, and while this might be one way by which individuals contract COVID-19, it is not the primary means nor is it the only means by which COVID-19 spreads. *Id.* Indeed, with or without actual COVID-19 contamination at any given property in the Commonwealth, businesses suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual contamination of property.

It is important to note that, although the contamination exclusion might, at times, cover viruses when viruses actually contaminate property, the contamination exclusion does *not* altogether exclude loss of use of property caused by viruses in any manner whatsoever. If Defendants wanted to exclude coverage for any loss caused by viruses in any manner

23

whatsoever, Defendants could have easily included such a provision clearly and unambiguously in the contract. However, Defendants did not include a virus exclusion.

In sum, because it is reasonable to conclude that the loss of use of property due to the risk of person-to person transmission of COVID-19 is not clearly and unambiguously encompassed by the contamination exclusion, Defendants failed to show that the contamination exclusion prevents coverage in this instance.[21]

Next, this Court will address the exclusion for Fungi, Wet Rot, Dry Rot and Microbes. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes." Plaintiff's Complaint at 118, Exhibit B. The insurance contract provides the following definition for the term "Microbes:"

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 19, Exhibit B.

Without any elaboration and explanation, Defendants contend that COVID-19 is excluded because viruses fall within the insurance contract's definition of the term "Microbe." This Court is, however, not persuaded that Defendants' interpretation of the term "Microbe" is clear and unambiguous.

---

[21] While this Court's above analysis is not dependent upon whether COVID-19 was in fact at Plaintiff's premises, Defendants' Cross Motions for Summary Judgment acknowledge that "Plaintiff neither alleged nor produced evidence that the virus was present at its dental offices . . . ." Valley Forge Insurance Company 's Cross Motion for Summary Judgment at 10; *see also* CNA's Cross Motion for Summary Judgment at 10. This fact provides further support that the contamination exclusion does not prevent coverage in this instance. Defendants cannot, at the same time, contend that the virus was not present at Plaintiff's property and that the exclusion contamination exclusion applies.

24

Naturally, upon its initial review, the contract's use of the word "Microbe" caused this Court to pause and generally wonder what is a "Microbe," and more specifically with regard to this case, does a virus qualify as a "Microbe?" Again, this begs the question: If Defendants wanted to exclude viruses, why not simply use the word virus explicitly in the insurance contract? Regardless, even assuming that a virus could technically be considered a "Microbe" in the most general sense of the word, this Court recognizes that, in this instance, it is of course not the general sense of the term "Microbe" that is controlling. Rather, because the insurance contract provides a specific definition of the term "Microbe," it is this definition that necessarily dictates what a "Microbe" is, and whether viruses fall within the ambit of the contract's "Microbe" exclusion.

Upon reading the insurance contract's definition of the term "Microbe," this Court determined that, in order to fall within the "Microbe" exclusion, COVID-19 must qualify as a "micro-organism" and/or an "organism." Because the contract does not define the terms "micro-organism" or "organism," this Court looked to the words' natural, plain, and ordinary meaning, and informed its understanding of these terms by considering their dictionary definitions. *Madison Construction Company,* 735 A.2d at 108.

Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size."[22] Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being.*"[23]

---

[22] Microorganism, Merriam-Webster, https://www.merriam-webster.com/dictionary/microorganism.

[23] Organism, Merriam-Webster, https://www.merriam-webster.com/dictionary/organism (emphasis added).

In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants."[24] In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."[25]

Based upon the ordinary, dictionary definitions of the terms "microorganism," "organism," and "virus," this Court concluded that: [1] the term "Microbe" generally includes things that carry on the activities of life, i.e., things that are alive; and [2] a virus is generally regarded as something that is non-living, and is capable of growth and multiplication only when it attaches to, or gets inside of, other living host cells. Accordingly, given the insurance contract's specific definition of the term "Microbe," it is reasonable to conclude that the "Microbe" exclusion does not actually encompass viruses, as viruses are generally not considered living things. Consequently, this Court determined that Defendants failed to demonstrate that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes clearly and unambiguously prevents coverage.

In reaching these conclusions, this Court of law does not masquerade as an expert in the complex intricacies of science, nor does it presume to wholly realize the subtle considerations by which trained scientists define and classify things in the natural world. This Court acknowledges that, in certain contexts, the terms "microorganism" and/or "organism" might refer to things that

---

[24] Virus, Merriam-Webster, https://www.merriam-webster.com/dictionary/virus (emphasis added).

[25] Sarah Kaplan et al., *The coronavirus isn't alive. That's why it's so hard to kill.*, The Washington Post, March 23, 2020 https://www.washingtonpost.com/health/2020/03/23/coronavirus-isnt-alive-thats-why-its-so-hard-kill/.

are not traditionally considered living entities.[26] This Court also understands that there are some in the scientific community who might classify viruses as a kind of semi-living, zombie-like thing.[27] However, this Court need not wade into the mire of such sophisticated considerations. The question before this Court on summary judgment is not so complicated. The question is simply whether the insurance contract provisions at issue are subject to more than one reasonable interpretation. If the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured. Again, this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *See Madison Construction Company,* 735 A.2d at 108. Based upon the above definitions, this Court determined that it is reasonable to interpret the "Microbe" exclusion as applying only to *living* microscopic things such as bacterium, and *not non-living* viruses.[28]

Next, this Court will address the exclusion for Consequential Loss. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused

---

[26] Merriam-Webster also defines "organism" in the most general sense as "a complex structure of interdependent and subordinate elements whose relations and properties are largely determined by their function in the whole." Organism , Merriam-Webster, https://www.merriam-webster.com/dictionary/organism. Merriam-Webster elaborates on this particular use of the word organism by providing the following quotation from Joseph Rossi: "the nation is not merely the sum of individual citizens at any given time, but it is a living organism, a mystical body . . . of which the individual is an ephemeral part." *Id.* Based upon this quotation, and the context in which the terms "microorganism" and "organism" appear in the insurance contract, this Court concluded that more scientific definition is most relevant to this Court's discussion.

[27] While there is some argument over whether viruses are living organisms, "[m]ost virologists consider them non-living, as they do not meet all the criteria of the generally accepted definition of life." *What are microorganisms?* Centre for Geobiology, University of Bergen, November 1, 2010 https://www.uib.no/en/geobio/56846/what-are-microorganisms.

[28] Bacterium is defined to include to following:

> any of a domain (Bacteria) . . . of chiefly round, spiral, or rod-shaped single-celled prokaryotic microorganisms that typically *live* in soil, water, organic matter, or the bodies of plants and animals, that make their own food especially from sunlight or are saprophytic or parasitic, are often motile by means of flagella, reproduce especially by binary fission, and include many important pathogens.

Bacterium, Merriam-Webster, https://www.merriam-webster.com/dictionary/bacterium (emphasis added).

directly or indirectly by "[d]elay, loss of use or loss of market." Plaintiff's Complaint at 41, Exhibit B. Defendants argue that even if Plaintiff had shown a basis for coverage under the insurance contract, this exclusion clearly and unambiguously excludes coverage.

The problem with this exclusion is not so much that it is unclear or ambiguous. Rather, the problem is that, based upon a plain reading of the Consequential Loss exclusion, this exclusion would vitiate Business Income, Extra Expense, and Civil Authority coverage in their entirety. *See* January 19, 2021 Court Order of the United States District Court, N.D. Ohio, Eastern Division case *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance Company*, Civil Case No. 1:20-cv-01239-DAP (holding that "the Loss of Use exclusion *would* vitiate the Loss of Business Income coverage"). This evident because, even if this Court accepted Defendants' more limited interpretation of the scope of coverage and the phrase "direct physical loss of or damage to property" to only include coverage in instances where Plaintiff's property was physically altered or damaged, this exclusion would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril, which closes Plaintiff's business while it is being repaired. *Id.* In other words, if this Court were to find the exclusion for Consequential Loss to be valid, this exclusion would make all Business Income, Extra Expense, and Civil Authority coverage illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose the majority of expected claims, such a provision is void as it renders coverage illusory). Because this Court must read the insurance contract in its entirety, and in a manner calculated to give the agreement its intended effect, this Court concludes that the exclusion for Consequential Loss does not prevent coverage.

28

Finally, this Court will address the exclusions for Acts or Decisions and Ordinance or Law. With regard to the exclusion for Acts or Decisions, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." Plaintiff's Complaint at 42, Exhibit B. With regard to the exclusion for Ordinance or Law, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the following:

> (1) The enforcement of any ordinance or law:
> (a) Regulating the construction, use or repair of any property; or
> (b) Requiring the tearing down of any property, including the cost of removing debris.
>
> (2) This exclusion applies whether the loss results from:
> (a) An ordinance or law that is enforced even if the property has not been damaged; or
> (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

Defendants argue that coverage is precluded by both of the above exclusions because Plaintiff's claim for "direct physical loss of or damage to property" is solely due to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both *"the COVID-19 pandemic* and the actions of the government in response thereto." Plaintiff's Complaint at 4 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision

29

of the contract.[29] Accordingly, Defendants failed to demonstrate that the exclusions for Acts or Decisions and Ordinance or Law preclude coverage.

## VI.    Conclusion

In Pennsylvania, "where there is doubt or uncertainty about the meaning of ambiguous language used in a policy of insurance, the policy must be construed in favor of the insured in order to not defeat the protection which [the insured] reasonably expected from the policy [the insured] purchased." *Raybestos-Manhattan, Inc.*, 433 A.2d at 483. This Court determined that Plaintiff's interpretations of the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract were, at the very least, reasonable. Additionally, this Court concluded that Defendants failed to demonstrate that any of the insurance contract's exclusions clearly and unambiguously prevent coverage. Accordingly, because there are no genuine issues of material fact, Plaintiff's Motion for Summary Judgment is GRANTED, and Defendants' Cross Motions for Summary Judgement are DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 3/22/21

---

[29] Certainly, the exclusions for Acts or Decisions and Ordinance or Law could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

30